894 So.2d 88 (2005)
Andrew Darryl BUSBY, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1364.
Supreme Court of Florida.
November 4, 2004.
As Revised on Denial of Rehearing February 3, 2005.
*90 Nancy A. Daniels, Public Defender and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Cassandra K. Dolgin, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Andrew Darryl Busby appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Based on our determination that the trial court committed reversible error in the denial of a challenge for cause, we reverse the conviction and vacate the sentence.

FACTUAL AND PROCEDURAL BACKGROUND
Although the reversal today renders the evidence, procedures, findings, and facts a total nullity, the facts and proceedings *91 upon which the jury error operated in this case are important for analysis of the error and its impact. Busby was convicted of the July 3, 2000, first-degree murder of Elton Ard. Ard was a fellow inmate of Busby's at the Columbia Correctional Institution (CCI). Ard was Busby's cellmate and was one of seven potential victims targeted by Busby and another inmate, Charles Globe. Evidence ascertained during trial indicated that the pair targeted Ard because he was harassing Busby.
On the morning of July 3, 2000, Ard was found dead in the cell he shared with Busby. Busby and Globe were also locked in the cell. An autopsy revealed that Ard had died from strangulation. In trial testimony, the medical examiner stated that Ard had injuries consistent with blunt force blows to his head, which did not contribute to his death. A garrote found in the cell was consistent with the pattern of bruising found on Ard's neck. Evidence recovered from the murder scene included a handwritten sign, photographs of writings on the prison wall, the magic marker used to make the writings, photographs of bloody fingerprints, a cigarette lighter found in Ard's hand, and a cigarette found in Ard's mouth.
After a series of interviews beginning around noon on July 3, 2000, both Busby and Globe confessed to killing Ard. At trial, the prosecution relied on Busby's July 3 statement as well as subsequent statements in which Busby revealed the sequence of events that transpired the night Ard was murdered. Busby did not testify in his own defense, but submitted a videotaped statement given by Globe in which Globe asserted responsibility for Ard's death.[1] The defense also offered the testimony of a jailhouse friend of Busby's who stated that Busby was small in stature and had been subjected to harassment while in prison.
On March 22, 2002, after the close of the evidence, instructions, and arguments by counsel, the jury found Busby guilty of first-degree murder. The penalty phase commenced during which both the prosecution and defense submitted evidence. At the close of the penalty phase, the jury voted eleven to one to recommend the death penalty. On May 16, 2002, the trial court followed the jury's recommendation and sentenced Busby to death.
The trial court found four statutory aggravating factors[2] and no statutory mitigating factors, and listed fifty-four nonstatutory mitigating factors that were presented by the defense.[3] The court *92 noted that some of the nonstatutory mitigating factors were repetitious and stated that each of the aggravating factors in this case, standing alone, would be sufficient to outweigh all the mitigation that was presented.

FOR-CAUSE CHALLENGE TO POTENTIAL JUROR LAPAN
Busby has asserted thirteen issues on appeal. We conclude that the trial court's error in denying Busby's challenge for cause against potential juror Kim Lapan requires reversal of Busby's conviction, and, therefore, decline to address the remaining twelve issues.[4] "Where an appellant claims he was wrongfully forced to exhaust his peremptory challenges because the trial court erroneously denied a cause challenge, both error and prejudice must be established." Conde v. State, 860 So.2d 930, 941 (Fla.2003). Based on the record before us, we conclude that Busby satisfies both prongs of that standard.

Trial Court's Error in Finding Lapan Competent to Serve
According to Busby, the trial court erred when it refused to grant Busby's *93 challenge for cause against Kim Lapan, a former guard of death row inmates at Florida State Prison. He argues that Lapan's acknowledged biases against death row inmates and admitted willingness to execute persons who had committed premeditated murders presented reasonable doubts as to his impartiality. We agree.
Lapan was not only a former correctional officer at Florida State Prison, he had worked directly on death row. He stated during voir dire that some of the correctional officers involved in the prison death of Frank Valdez[5] were friends of his. During voir dire, the following exchange occurred between Lapan and defense counsel:[6]
[By the defense]
Q Mr. Lapan, would you say that you oppose or you are in favor [of the death penalty] 
A I am in favor of it. I worked in Florida state prisons.
Q Did you work on death row?
A Yes.
. . . .
Q Based upon your experiences as a correctional officer, if I told you that you would end up learning this homicide occurred inside a prison, do you think that would affect your ability to sit as a juror?

A Possibly.

Q Would that be something that knowing the position that you held before, you might consider something an aggravating circumstance beyond what the judge says, based on your own personal experiences?
A Possibility.
Q We talk about aggravating circumstances. You understand that's what the judge is going to read as far as the circumstances that are recognized by law to possibly warrant a death penalty?
A Yes.
Q And mitigating circumstances being those circumstances the law says you can consider as to whether a life imprisonment sentence might be appropriate. You understand that as well?
A Yes.
Q Knowing that you have worked on death row as well, you understand these days life means life?
A Right.
Q Knowing that, do you think that based on your experiences as a correctional officer that worked on death row, that there might be things in your mind that are aggravating circumstances that you would consider outside those that the judge read you, particularly once you learn that this homicide was 
A No. I don't think so. I think I can determine what the judge wants and go by what they feel are the parameters we are supposed to stay within.
Q So what you are saying, even though you worked as a correctional officer for eight years 
A Yes, sir.
Q  with part of that time spent on death row 
A Yes, sir.
Q  that you don't think that any of your own personal experiences would *94 come into play as far as maybe you think something is an aggravating circumstance that could possibly warrant a death sentence that was not included in the judge's instructions?
A I would like to think I could be openminded enough.
. . . .
Q Do you believe that life in prison is severe enough punishment for someone who is found guilty of premeditated murder?

A No.

Q If  understanding that you have to find Mr. Busby guilty of premeditated murder for us to make it to a second phase?
A Yes.
Q Would that fact be considered by you as an aggravating circumstance that might cause you to vote for death  the judge is not going to tell you that is an aggravating circumstance. But knowing that  to get to the second phase you would have to find Mr. Busby guilty of premeditated murder, do you think that would be something that would weigh in favor of the death sentence in your mind?
A No, I don't think so.
Q Are there any cases that you can think of particularly based upon you working on death row? Are there any cases that you think would automatically warrant the death penalty regardless of aggravating and mitigating circumstances?
A Yes.
Q What would that be?
A Child molesters. Some of the heinous crimes that are committed, the way they murder or kill, what they have done to the victims. Their past history on  you know, can they, you know, what will happen when they have done their time  there isn't time. That's right.
. . . .
Q Are there any other circumstances that you can think of 
A I can't think of any offhand.
. . . .
Q Now you had mentioned someone having been convicted prior of crimes. Might in your mind be something that would cause you to automatically vote for the death sentence?

A Possibly.

Q I think you are anticipating my next question. Is that a situation where no matter what mitigation circumstances are given, vote for death regardless of the mitigating circumstances?
A Unless there is extremely  proof is proof. I am not understanding some of the questions. They are so hypothetical. That, you know 
Q I am going to clarify this one question involving a situation where someone had previously been convicted of a crime. What I am asking is, is that one of those situations where no matter how much proof of mitigation 
A No.
Q  you would say, no, that crime is a death penalty every time in my mind?
A No.
Q While you were at F.S.P., were you ever the victim of any assaults?
A Yes.
Q Do you think that is something in your own mind if you learn that this had taken place in a correctional institution would factor in regardless of what the judge said as far as affecting your mind?

THE COURT: You can answer that if that the going to affect your decision in this case.

*95 THE PROSPECTIVE JUROR: I don't know.

BY MR. DOSS [The Defense]:
Q If the judge instructs you to set your personal feelings aside, would that be something you can or can't set aside?
A I believe I can.
The defense moved to strike Lapan for cause after individual voir dire based on his experience as a correctional officer on Florida's death row. Defense counsel expressed doubt that Lapan could set aside those experiences, despite his assertions that he could. The trial court denied the motion. After group voir dire, the defense again moved to strike Lapan for cause, this time citing Lapan's friendship with officers in the Valdez case, and the different "biases and prejudices" he had. The motion was again denied.
"It is within a trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error." Fernandez v. State, 730 So.2d 277, 281 (Fla.1999). The decision to deny a challenge for cause will be upheld on appeal if there is support in the record for the decision. See Gore v. State, 706 So.2d 1328, 1332 (Fla.1997); see also Mendoza v. State, 700 So.2d 670, 675 (Fla.1997) ("A trial court has latitude in ruling upon a challenge for cause because the court has a better vantage point from which to evaluate prospective jurors' answers than does this Court in our review of the cold record."); Smith v. State, 699 So.2d 629, 635-36 (Fla.1997) ("In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court is able to see the jurors' voir dire responses and make observations which simply cannot be discerned from an appellate record.").
The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995); see also Hill v. State, 477 So.2d 553, 556 (Fla.1985) (providing that if "any reasonable doubt exists as to whether a juror possesses the state of mind necessary to render an impartial recommendation as to punishment, the juror must be excused for cause").
In this case, all three prospective jurors who were working as correctional officers at the time of the voir dire were dismissed for cause. Neither of the two potential jurors with prior experience as correctional officers was dismissed for cause. This Court has consistently held that the mere fact that someone is a correctional officer is not per se grounds for a cause challenge. See State v. Williams, 465 So.2d 1229, 1230 (Fla.1985) (holding that the court did not err when it denied challenge for cause against two correctional officers in a prosecution for battery against a correctional officer in a correctional institution); Lusk, 446 So.2d at 1041; Morgan v. State, 415 So.2d 6, 10 (Fla.1982). Therefore, the fact that Lapan was a former correctional officer was not, in and of itself, grounds for a cause challenge.
The question for this Court is whether the trial court should have granted a cause challenge based on Lapan's responses when he was asked if he could be impartial in serving on Busby's jury. Lapan gave very equivocal responses to *96 several critical questions regarding his ability to serve as an impartial juror in this type of case. The mere fact that a juror gives equivocal responses does not disqualify that juror for service. The question is whether the responses voiced by Lapan were equivocal enough to generate a reasonable doubt about his fitness as a juror. "In evaluating a juror's qualifications, the trial judge should evaluate all of the questions and answers posed to or received from the juror." Parker v. State, 641 So.2d 369, 373 (Fla.1994). The trial court must excuse a prospective juror for cause if "any reasonable doubt" exists regarding his ability to render an impartial judgment and recommendation as to punishment. See Bryant, 656 So.2d at 428; Hill, 477 So.2d at 556.
Lapan's equivocation on multiple sensitive and material questions regarding his ability to be impartial raise reasonable doubt about his fitness to serve as a juror in this type of case, and should have resulted in his being excused from the panel for cause. Importantly, Lapan responded that the fact that the accused had been convicted of prior crimes (as Busby had) might cause him to automatically vote for the death penalty. When asked whether he believed life imprisonment was severe enough punishment for a person convicted of premeditated murder, he answered, "No." Lapan also stated that because the homicide occurred inside a prison, his ability to serve as an impartial juror might be compromised. In a further response, Lapan indicated that he might construe such a fact as an aggravating circumstance, even beyond those aggravating circumstances as might be instructed by the trial judge. When specifically asked whether learning that the crime had taken place in a correctional institution would factor in his consideration of the case regardless of what the judge said, he voiced a highly suspect response of "I don't know." When asked whether he could comply with the trial court's instructions to set his personal feelings aside, Lapan could only muster a very weak "I believe I can." The nature of the case and the sentencing possibilities elevate our concern.
We recognize that although we are assessing Lapan's voir dire responses from a cold record,[7] the sequence of the questions and plainness of Lapan's responses leaves little doubt that, as a former death row prison guard, he was understandably unable to set aside his beliefs and experiences to serve as an impartial juror in a case involving a prison murder. Lapan equivocated on the very issue most crucial to his ability to deliberate in an unbiased manner to reach the appropriate verdict and sentencing recommendation. In our view, the record can support no other conclusion than that Lapan should have been excused for cause.

Prejudicial Impact
Having determined that the trial court erred in denying Busby's challenge to prospective juror Lapan for cause, our focus now turns to whether the error requires a new trial. In the State of Florida, expenditure of a peremptory challenge to cure the trial court's improper denial of a cause challenge constitutes reversible error if a defendant exhausts all remaining peremptory challenges and can show that an objectionable juror has served on the *97 jury. See Trotter v. State, 576 So.2d 691 (Fla.1991). As explained in Trotter, "This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted." Id. at 693. A defendant cannot demonstrate prejudice if the trial court grants the same number of additional peremptories as cause challenges that were erroneously denied. See Conde, 860 So.2d at 942. There is no question that Busby has satisfied the Trotter standard in this case.
After the court denied the challenge for cause as to Lapan, defense counsel requested and was denied additional peremptory challenges. Counsel then identified jurors Liebel and Winston as objectionable jurors for whom he would have used the extra peremptory challenges had they been granted. Both Liebel and Winston had sons who also worked as correctional officers. Although neither was challenged for cause, Liebel was dismissed after being impaneled for sleeping during the trial and was replaced by an alternate juror. Winston, however, served on the final jury and participated in the verdict convicting Busby. Having exhausted his peremptory challenges, and having identified Winston as an objectionable juror who he would have otherwise removed from the prospective panel with a peremptory challenge, Busby satisfied the Trotter standard for prejudice and qualifies for a new trial.
The ably written dissent posits that it is time to abandon the Trotter standard, and institute a rule whereby the defendant must show "actual harm" for a conviction to be reversed. According to the dissent, actual harm would occur where the juror identified as "objectionable" is "legally objectionable," or one who is biased or partial. In other words, one would be required to demonstrate that such juror should also have been excused for cause. We decline to modify the Trotter standard based on our determination that the Trotter test is necessary to properly protect the right to trial by an impartial jury accorded every defendant in this state, and to effectuate the statutory scheme granting peremptory challenges. The dissent would dismantle the peremptory challenge framework.
"The peremptory challenge has very old credentials." Swain v. Alabama, 380 U.S. 202, 212, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled by Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[8] The right to peremptory challenges *98 became the settled law of England in the middle ages, and was accepted by most American colonial courts. In 1790, Congress codified the English practice, by granting peremptory challenges to defendants in capital cases. See Swain, 380 U.S. at 214, 85 S.Ct. 824. Over the years, the federal rules were expanded to provide peremptory challenges in noncapital criminal cases and civil cases. See id. at 214 n. 14, 85 S.Ct. 824.
The law of peremptory challenges at the state level followed a similar evolutionary path. Today, every state provides peremptory challenges to both parties in criminal and civil cases. See id. at 216-17, 85 S.Ct. 824. In Florida, one's entitlement to peremptory challenges is long-standing. In fact, the entitlement to peremptory challenges preceded Florida's statehood. See Act of November 23, 1828, § 48, 1839 Compilation of the Public Acts of the Legislative Council of the Territory of Florida 89, 99 ("[A]t the trial of all causes brought to the superior or county courts, either party shall have the right to challenge peremptorily four jurors, and as many more as he can show good cause for.")
The use of peremptory challenges has persisted despite detractors' arguments that they delay trials, increase trial expense, and are used to eliminate otherwise qualified jurors. See Swain, 380 U.S. at 216, 85 S.Ct. 824. As recognized by the United States Supreme Court, "The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." Id. at 219, 85 S.Ct. 824; see also United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). Indeed, as this Court has recognized, the very purpose of peremptory challenges is "the effectuation of the constitutional guaranty of trial by an impartial jury." Meade v. State, 85 So.2d 613, 615 (Fla.1956); see also Francis v. State, 413 So.2d 1175, 1178 (Fla.1982), receded from on other grounds by Muhammad v. State, 782 So.2d 343 (Fla.2001). Although peremptory challenges are not themselves constitutionally guaranteed at either the state or federal level, such challenges are nonetheless "one of the most important of the rights secured to the accused." Swain, 380 U.S. at 219, 85 S.Ct. 824 (quoting Pointer v. United States, 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894)).
Focusing only on criminal trials for purposes of the instant analysis, Florida law provides both cause and peremptory challenges to both sides involved in criminal proceedings. See §§ 913.03; 913.08, Fla. Stat. (2003). Section 913.03 of the Florida Statutes outlines the grounds that support cause challenges. These grounds include: the absence of qualifications required by law; the juror being of unsound mind or beset by physical defects rendering him unable to perform the duties of a juror; the juror having conscientious beliefs that would preclude finding the defendant guilty; and a host of other grounds pertaining to the juror's prior involvement in legal proceedings adverse to, or involving, the accused. See § 913.03(1)-(9), Fla. Stat. (2003). This section also allows for cause challenges on more general grounds bearing on the juror's impartiality. The pertinent subsection provides:

*99 The juror has a state of mind regarding the defendant, the case, the person alleged to have been injured by the offense charged, or the person on whose complaint the prosecution was instituted that will prevent the juror from acting with impartiality, but the formation of an opinion or impression regarding the guilt or innocence of the defendant shall not be a sufficient ground for challenge to a juror if he or she declares and the court determines that he or she can render an impartial verdict according to the evidence....
§ 913.03(10), Fla. Stat. (2003). Thus, juror impartiality is a firm basis for excusing a prospective juror for cause in the State of Florida.
Florida law also provides the prosecution and criminal defendants with the same number of peremptory challenges. Each side is permitted ten peremptory challenges if the offense is punishable by death or life in prison, six if the offense is punishable by more than twelve months in prison (but not punishable by life in prison or death), and three for all other offenses. See § 913.08(1), Fla. Stat. (2003). The statute does not enumerate the grounds which would support the exercise of a peremptory challenge because, as has long been recognized by Florida courts, use of a peremptory challenge need not be supported by a reason, so long as the challenge is not used to discriminate against a protected class of venireperson. See Francis, 413 So.2d at 1179 ("[The peremptory challenge] is an arbitrary and capricious right which must be exercised freely to accomplish its purpose."); Shannon v. State, 770 So.2d 714, 716 (Fla. 4th DCA 2000) (stating that a peremptory challenge "need not be supported by any reason, although a party may not use such a challenge in a way that discriminates against a protected minority") (quoting Black's Law Dictionary 223 (7th ed.1999)).
Thus, Florida law provides for two separate types of challenges to potential jurors with distinctly different underpinnings. Cause challenges can be made on certain enumerated grounds, including a potential juror's impartiality. Peremptory challenges, on the other hand, can be used to excuse a juror for any reason, so long as that reason does not serve as a pretext for discrimination. The United States Supreme Court succinctly characterized the distinctions between cause and peremptory challenges as follows:
The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. It is often exercised upon the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another," Lewis [v. United States, 146 U.S. 370, 376, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)], upon a juror's "habits and associations," Hayes v. Missouri, [120 U.S. 68, 70, 7 S.Ct. 350, 30 L.Ed. 578 (1887)] or upon the feeling that "the bare questioning [a juror's] indifference may sometimes provoke a resentment," Lewis, [146 U.S. at 376, 13 S.Ct. 136].
Swain, 380 U.S. at 220, 85 S.Ct. 824 (citations omitted). On this basis, cause and peremptory challenges comprise distinct, but complementary, methods to aid those facing criminal charges in achieving the constitutional right of trial by an impartial jury. Accord Thomas v. Commonwealth, 864 S.W.2d 252, 259 (Ky.1993)
*100 Despite the grant of the two clearly separate and distinct types of challenges under Florida law, the dissent recommends that this Court essentially convert peremptories into cause challenges under the circumstances here. Under the theory espoused by the dissent, a defendant could qualify for relief for the erroneous denial of a cause challenge, and concomitant forced expenditure of a peremptory, only if a "legally objectionable," or biased, juror sat on the ultimate jury panel. Such a theory blurs any distinction between cause and peremptory challenges.
The value of peremptory challenges is that they are intended and can be used when defense counsel cannot surmount the standard for a cause challenge. Requiring the defendant to show actual bias  the standard applicable to cause challenges  for the forced expenditure of a peremptory challenge renders the separate statutory grant of peremptory challenges totally meaningless. Such a construction also renders superfluous that aspect of section 913.03 which sets forth juror impartiality as grounds for a cause challenge, as the same showing would be required to vindicate the statutory right to exercise a peremptory challenge after a trial court has erroneously caused the loss of a peremptory challenge. Finally, the interpretation endorsed by the dissent would amplify the ability of one party to use peremptory challenges at the expense of the other in contravention of the plain language of section 913.08, which grants each party to a criminal proceeding the same number of peremptory challenges. Cf. People v. LeFebre, 5 P.3d 295, 304 (Colo.2000) (holding that state law requiring both sides to receive the same number of peremptories unless good cause is shown rendered the wrongful grant of a prosecutorial cause challenge a violation of the defendant's due process rights). Such interpretations directly undercut this Court's charge of interpreting statutes as a harmonious whole, giving effect to each of their constituent parts. See Acosta v. Richter, 671 So.2d 149, 153-54 (Fla.1996).
While the deleterious consequences of the interpretation espoused by the dissent may not be readily apparent in a case involving one curative use of a peremptory strike, it comes into stark relief when one considers what might occur if the trial court were to wrongly, but not purposefully or intentionally, deny two or more cause challenges. In such instance, the defendant would be in the position of expending many, if not all, of the peremptories allotted to correct the trial court's errors, and consequently would be deprived of the entitlement to challenge those jurors whose voir dire answers reveal a real potential for bias, but who would otherwise not be subject to a challenge for cause. See Johnson v. State, 43 S.W.3d 1, 6 (Tex.Crim.App.2001) ("If one of an accused's peremptory challenges could be taken away from him, why not five be taken, and if five, why not ten, leaving none, and all jurors be acceptable save unfair and partial ones.") (quoting Wolfe v. State, 147 Tex.Crim. 62, 178 S.W.2d 274, 279-80 (1944)). Under such a scenario, a defendant would lose the ability to exercise peremptories as a separate and distinct class of challenges as provided under Florida law. Nothing in the jurisprudence of this Court, including our decisions requiring a defendant to expend curative peremptory challenges, supports such a result.
The Trotter standard currently in place properly preserves the distinctions between cause and peremptory challenges. Under the existing standard, a defendant can obtain relief for the erroneously forced expenditure of a peremptory by showing the same type of harm such challenges are intended to cure  the seating of a juror whom the defendant suspects, but cannot *101 prove, is biased. The defendant is not forced into the impossible situation of protecting his or her entitlement to peremptory challenges by proving harm under the for-cause standard.
Contrary to the characterization cast by the dissent, the Trotter standard has not thrown wide the doors to multitudes of defendants seeking a new trial because of erroneously denied cause challenges. In twelve of the seventeen opinions in which this Court has addressed denial of cause challenges under Trotter, the Court has determined that the defendant did not preserve prejudicial error. In three of those cases, the defendant failed to exhaust all peremptory challenges;[9] in seven of the cases, the defendant failed to identify a seated juror whom he or she would have excused if allowed;[10] and in three, the defendant received additional peremptories to replace each erroneously denied cause challenge.[11] In four of the five cases in which the issue was deemed preserved for review, this Court determined that the trial court did not err in denying the for-cause challenge.[12] Thus, in its fourteen-year history, application of the Trotter standard by this Court has not resulted in the reversal of a conviction prior to the Court's decision today. The Trotter standard has proven to be an effective means of protecting the right of defendants to use peremptory challenges, while respecting the integrity of the verdicts rendered by juries in this state.
The dissent draws support for its position from the United States Supreme Court's decisions in Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). The dissent posits that these cases make clear that there is no federal constitutional right to peremptory challenges, and that the denial of these challenges does not constitute reversible error absent a showing that a legally objectionable juror served on the jury. We are aware of the holdings in both cases cited by the dissent, but ultimately determine that they have little impact on how this Court should interpret Florida's constitutional safeguards and the law governing the use of cause and peremptory challenges in the instant context. In so doing, we note that the High Court has never addressed whether the erroneous denial of a cause challenge that is preserved under the Trotter requirements constitutes reversible error.[13]
*102 In Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Supreme Court considered, in pertinent part, whether the curative use of a peremptory challenge violates the right to trial by an impartial jury guaranteed by the Sixth or Fourteenth Amendments. Noting that the Court had long recognized that peremptory challenges are "not of constitutional dimension," the High Court held that the loss of a peremptory challenge, without more, does not violate the right to an impartial jury. Id. at 88, 108 S.Ct. 2273. According to the Ross Court, "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Id.
As the arbiters of the meaning and extent of the safeguards provided under Florida's Constitution, we reiterate that the ability to exercise peremptory challenges as provided under Florida law is an essential component to achieving Florida's constitutional guaranty of trial by an impartial jury. See Meade, 85 So.2d at 615. Our decisions requiring a defendant to expend a peremptory challenge to cure an erroneous ruling on a cause challenge does not signal our intent to treat cause and peremptory challenges interchangeably, or to associate peremptory challenges with less significance. To the contrary, we have consistently determined that reversible error occurs to the extent a party is forced to expend a peremptory challenge to cure a wrongly denied cause challenge can show that he or she has exhausted the remaining peremptory challenges, and that an objectionable juror was seated on the ultimate jury panel. See Trotter, 576 So.2d at 692. The harm suffered by the defendant under such a scenario is having been forced to accept a juror he or she would have peremptorily excused but for the need to remedy the trial court's error. See Farias v. State, 540 So.2d 201, 203 (Fla. 3d DCA 1989) ("It is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause since it has the effect of abridging the right to exercise peremptory challenges."); Smith v. State, 463 So.2d 542, 545 (Fla. 5th DCA 1985) (same). We believe the Texas Court of Criminal Appeals eloquently expressed this concept as follows:
It is the privilege of accused to exclude from service one whom [sic], in his judgment is unacceptable to him. In conferring it, the law gives effect to the natural impulse to eliminate from the jury list not only persons who are rendered incompetent for some of the disqualifying causes named in the statute, but persons, who, by reason of politics, religion, environment, association, or appearance, or by reason of the want of information with reference to them, the accused may object to their service upon the jury to which the disposition of his life or liberty is submitted. In other words, the law fixes the number of challenges and confers upon the accused the right to arbitrarily exercise them. This right having been denied the appellant in the instant case, he having exercised *103 all of the challenges the court would permit him to use, and having been forced to try his case before jurors who were objectionable and whom he sought to challenge peremptorily, the verdict of conviction rendered by the jury so selected cannot, we think, with due respect to the law, be held to reflect the result of a fair trial by an impartial jury, which it is the design of our law shall be given to those accused of crime.
Johnson, 43 S.W.3d at 6 (quoting Kerley v. State, 89 Tex.Crim. 199, 230 S.W. 163, 164-65 (1921)). We agree with the Texas court in concluding that the curative use of a peremptory challenge violates a defendant's right to a trial by impartial jury when that defendant can show that he or she went without the peremptories needed to strike a seated juror.
Moreover, we do not consider persuasive the Ross Court's reasoning with regard to the due process concerns associated with forcing a defendant to expend a peremptory challenge to cure a wrongly denied cause challenge. The Ross Court held that the curative use of a peremptory challenge did not violate due process guarantees because the Oklahoma law at issue required a defendant to cure an erroneous for-cause ruling by exercising a peremptory challenge, and thus the defendant had received all that was due under state law. See 487 U.S. at 89, 108 S.Ct. 2273. However, it appears that the Oklahoma statute at issue in Ross required a defendant to expend a curative peremptory, exhaust his or her remaining peremptories, and show that an "incompetent" juror sat on the ultimate panel. See id. The opinion explained that after defense counsel in that case had used a peremptory challenge to remove a juror who should have been removed for cause, he exhausted his peremptory challenges, but did not assert and present a cause challenge to any juror remaining on the panel. See id. at 84, 108 S.Ct. 2273. This Oklahoma law apparently required an additional act as a necessary prerequisite to establishing that an "incompetent" juror served on the panel. Thus, it appears that the defendant in Ross could not have obtained relief under Oklahoma law.
Florida law, on the other hand, requires only that the defendant expend a curative peremptory challenge, exhaust the remaining peremptories, and identify a seated juror whom the defendant otherwise would have peremptorily excused according to established law. Stated another way, Florida law provides defendants a stated number of peremptory challenges, less those necessary to cure erroneously denied cause challenges, so long as the defendant is "made whole" with additional peremptories to the extent he or she seeks to challenge objectionable jurors. If the defendant desires to peremptorily challenge a juror, but is without remaining challenges due to the need to correct the trial court's errors, he has not, according to our interpretations, received "that which state law provides." Id. at 89, 108 S.Ct. 2273.
The dissent's recommendation to maintain Trotter's requirements, but to require defendants to show that a seated juror was actually biased, would construct the ultimate Catch-22 for accused individuals in this state. It would be fundamentally unfair to require that a defendant take every step possible to obtain an impartial jury by correcting the trial court's error, and then to deny relief because the defendant has not demonstrated he or she was denied an impartial jury. We could remedy the inequity of this result by jettisoning the Trotter standard altogether in favor of the federal practice, which does not require defendants to expend curative peremptory challenges to preserve the erroneous denial of a cause challenge for review. See Martinez-Salazar, 528 U.S. at 306, 120 *104 S.Ct. 774. However, such a "remedy" would not, in our view, serve the ends of justice. The practice would force the defendant to accept a biased juror as a price of preserving the issue on appeal. As we stated in Trotter, our concern in implementing the existing standard is that a defendant not "stand by silently while an objectionable juror is seated and then, if the verdict is adverse, obtain a new trial." Trotter, 576 So.2d at 693.
Finally, this Court is not swayed by the fact that some state courts have reconsidered their state law in the wake of Ross and Martinez-Salazar, opting to limit reversal to those cases in which a legally objectionable juror sits on the jury. See Dissenting op. at 108-09. The opposite is also true. Several state courts have declined to extend the analysis in Ross and Martinez-Salazar to their jurisdictions. See LeFebre, 5 P.3d at 308 ("That federal law governing the use of peremptory challenges differs from Colorado law governing the use of peremptory challenges does not alter the effect of Ross when applied to Colorado law."); State v. Santelli, 159 Vt. 442, 621 A.2d 222, 224-25 (1992) (stating that the prejudice standard would render trial court errors unreviewable by shifting the focus to the qualifications of the juror subject to the lost peremptory instead of the court's error); Johnson, 43 S.W.3d at 6 (disapproving appeals court's reliance on Ross, stating that the decision "does not change the way that the Court of Criminal Appeals has interpreted state law"). We choose not to turn Florida law on its head with regard to the error corrected here which would unnecessarily occur if we were to adopt the dissenting view.
In fact, it is interesting to note that only a bare majority of state courts require a showing that a biased juror actually sat on the jury panel. Nineteen other states in addition to Florida require reversal when a defendant is wrongly denied the use of a peremptory challenge.[14] Many of these jurisdictions apply a standard similar to that applied in Florida, requiring that the *105 defendant identify a juror he or she would have excused with a peremptory challenge, had one been available.[15] However, many states have even more lenient standards, requiring only that the defendant exhaust his or her peremptory challenges.[16]
Ultimately, we perceive no justifiable reason for receding from the Trotter standard. While not expressly provided for in Florida's Constitution, peremptory challenges are a necessary tool for achieving the constitutional right of a trial by an impartial jury. We are willing to demand that defendants use that tool to correct erroneous rulings on cause challenges, but to do so without replacement of the peremptory challenges utilized would, under the jurisprudence of this state, abridge the rights of the accused. We believe the Trotter standard continues to serve as the best mechanism for ensuring that such abridgment does not occur.

CONCLUSION
For the reasons stated herein, we reverse Busby's conviction, vacate his sentence, and remand the case for a new trial consistent with this opinion.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS and QUINCE, JJ., concur.
BELL, J., concurs in part and dissents in part with an opinion, in which WELLS and CANTERO, JJ., concur.
BELL, J., concurring in part and dissenting in part.
I agree with the majority's holding that the trial judge should have granted Busby's cause challenge to venireperson Lapan. However, because Busby has not shown that this procedural error harmed his constitutional right to a fair and impartial jury, I dissent to the reversal of the conviction.
Indeed, the trial judge made an error in his ruling on one of Busby's eight cause challenges.[17] Such mistakes are made by *106 the best of judges in the fast-paced, contentious process of jury selection. And Busby corrected this error by using the tool the State provided him to immediately remedy such inevitable mistakes. He did so by using one of the ten statutory peremptory challenges given to him in section 913.08(1)(a), Florida Statutes (2000). Later, after exhausting all of his statutory peremptory challenges on jurors who were not removable for cause, Busby tried to recoup the peremptory challenge he used on Lapan by requesting an additional peremptory. He wanted to use this additional peremptory challenge to strike a legally unobjectionable juror. The trial judge denied this request.
Ultimately, Busby received what our federal and state constitutions guarantee him. He received a trial by a fair and impartial panel of twelve jurors who reached a unanimous verdict. Each juror was qualified to serve. Not one of them was legally objectionable. Nonetheless, the majority vitiates this jury's verdict; and it does so without requiring Busby to show any harm. The only basis for this severe sanction is the continued application of the Trotter per se error rule.
I dissent because the Trotter per se error rule has four deficiencies: (1) it lacks any adequate constitutional or statutory basis; (2) it ignores one of the primary purposes of peremptory challenges; (3) it is contrary to the presumption of juror impartiality; and (4) it violates section 924.33, Florida Statutes (2003), which requires the application of a harmless error standard. To make the rule legally sound, we should modify the Trotter per se error rule to require the showing of harm.
To explain these four deficiencies of the Trotter per se error rule, I will start with a brief review of the legal history of peremptory challenges. We will see that the per se error rule was a reaction to dicta in the United States Supreme Court decision in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), where that Court stated that the federal constitution demanded such a strict standard. However, the United States Supreme Court later clarified this dicta in Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), when it held that a per se reversal rule is not constitutionally required. We will also see that Florida law on the legal significance of peremptory challenges was consistent with the legal significance accorded them by the United States Supreme Court prior to Swain, adjusted course post-Swain, but failed to correct course after that Court reversed itself. This historical examination also will show that post-Trotter developments remove any firm legal basis to support a per se reversible error rule.
After this examination of the legal history, I will briefly discuss the majority opinion. Essentially, the majority gives peremptory challenges an elevated status beyond what is typically given to nonconstitutional, statutory procedural rights. We will see that this elevated status of peremptory challenges is contrary to this Court's precedents.
Essentially, I will show that modifying the Trotter standard to require a showing of harm is most consistent with the historically understood purpose of peremptory challenges as procedural tools of no constitutional dimension that are designed to help the State fulfill its constitutional duty of providing fair and impartial juries to all parties.[18] And, because peremptory challenges are of no constitutional dimension, *107 section 924.33, as well as our precedent, require application of the harmless error standard of review.

I. A BRIEF HISTORY OF PEREMPTORY CHALLENGES

A. THE LAW PRIOR TO TROTTER

Peremptory challenges have had a long and storied history.[19] This Court has consistently recognized that these challenges are not of constitutional dimension but are a means to ensure that defendants receive an impartial jury. See Carroll v. State, 139 Fla. 233, 190 So. 437, 438 (1939).
In Rollins v. State, 148 So.2d 274, 276 (Fla.1963), this Court refused to reverse a conviction based on an erroneous denial of a cause challenge because a peremptory challenge was used on the objectionable venireperson. As Busby did, Rollins exhausted his peremptory challenges, but this Court held that there was no showing that an objectionable or unqualified juror served on the jury. This Court defined "objectionable" juror as one that is legally objectionable or unqualified to serve. Id.
In Swain, 380 U.S. at 219, 85 S.Ct. 824, the United States Supreme Court stated in dicta that the "denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." This Court applied the Swain dicta in Hill v. State, 477 So.2d 553 (Fla.1985). The trial court in Hill erroneously denied a cause challenge, and Hill used a peremptory on the objectionable venireperson. With little analysis, this Court stated:
We find that such error cannot be harmless because it abridged appellant's right to peremptory challenges by reducing the number of those challenges available him. Florida and most other jurisdictions adhere to the general rule that it is reversible error for a court to force a party to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied. See Singer[ v. State, 109 So.2d 7 (Fla.1959)]; Leon v. State, 396 So.2d 203 (Fla. 3d DCA 1981). See also Wasko v. Frankel, 116 Ariz. 288, 569 P.2d 230 (Ariz.1977); Jones v. Cloud, 119 Ga.App. 697, 168 S.E.2d 598 (1969); State v. Sugar, 408 So.2d 1329 (La.1982); State v. Ternes, 259 N.W.2d 296 (N.D.1977), cert. denied, 435 U.S. 944, 98 S.Ct. 1524, 55 L.Ed.2d 540 (1978); Commonwealth v. Jones, 477 Pa. 164, 383 A.2d 874 (Pa.1978); Martin v. Commonwealth, 221 Va. 436, 271 S.E.2d 123 (Va.1980).
Hill, 477 So.2d at 556. The majority of the cases cited in Hill cite to Swain as authority. This Court did not provide a state constitutional or statutory law basis for its holding in Hill. Thus, the most reasonable inference is that the decision was based on federal constitutional requirements in light of Swain.
Four years later, this Court considered a similar situation in Hamilton v. State, 547 So.2d 630 (Fla.1989). The trial court in Hamilton erroneously denied a cause challenge to a juror. Although Hamilton could have used one of his remaining peremptory challenges to remove the challenged juror, he elected not to do so. At the conclusion of voir dire, after Hamilton had exhausted his peremptory challenges, he requested an additional peremptory *108 challenge so he could backstrike the juror. The request was denied, and the biased juror sat on the panel that issued a verdict in the case. This Court held that "the failure to excuse this juror upon motion deprived Hamilton of his constitutional right to a fair trial, requiring us to reverse the conviction and remand this case for a new trial." Hamilton, 547 So.2d at 633. Hamilton differs from Hill in that a legally objectionable juror actually served on the jury in Hamilton.
Twenty-three years after Swain was decided (but only three years after Hill), the United States Supreme Court confronted the question before us in Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). The Court addressed Ross's arguments based on federal constitutional rights and then on state law. First, the Court held that peremptory challenges are not of federal constitutional dimension and rejected the argument that, without more, "the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." Id. at 88, 108 S.Ct. 2273. The Court concluded that, because peremptory challenges are only a means to achieve the end of an impartial jury, whether a litigant is "forced" or "required" to exercise a peremptory challenge does not violate the Sixth Amendment so long as the jury that sits is impartial. See id. at 88, 108 S.Ct. 2273.
Second, the Court considered and rejected Ross's argument that the trial court's failure to remove a juror for cause "violated his Fourteenth Amendment right to due process by arbitrarily depriving him of the full complement of nine peremptory challenges allowed" under state law. Id. at 89, 108 S.Ct. 2273. The facts in Ross are nearly identical to those in this case, and the Oklahoma law is very similar to Florida law in that a defendant who disagrees with a trial court's ruling on a cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. The Court held that such a requirement is consistent with the ultimate goal of empaneling an impartial jury. Id. Thus, the Court concluded that Ross did not lose any state law right when he used one of his challenges to remove a juror who should have been excused for cause. Instead, the Court held that Ross received all that state law allowed him and received the fair trial guaranteed by the federal constitution. Id. at 90-91. And, contrary to the majority's position in this case, the Court in Ross found that this blurring of the distinction between peremptory and cause challenges did not violate Oklahoma law nor did it violate Ross's due process rights. However, the Court did tacitly acknowledge that repeated and deliberate misapplication of the law by the trial court might rise to the level of a due process violation. See id. at 91 n. 5.[20]

*109 B. THE TROTTER STANDARD
In Trotter v. State, 576 So.2d 691 (Fla.1991), this Court held:
Where a defendant seeks reversal based on a claim that he was forced to exhaust his peremptory challenges, he initially must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted.
Trotter, 576 So.2d at 693. We have interpreted Trotter not to require an actual showing of bias or partiality on the part of the juror.[21] Thus, the mere objection to any juror who actually sits on the jury is sufficient to warrant automatic reversal. Under this standard, a defendant could object to a clearly neutral or even a defense-friendly juror and still be entitled to a new trial. As Judge Harris noted, "Trotter, in effect, grants a reversal of even a fair verdict in order to reward a party for properly following the procedure to preserve the error." Gootee v. Clevinger, 778 So.2d 1005, 1013 (Fla. 5th DCA 2000) (Harris, J., dissenting). Importantly, neither Trotter nor the cases that it cites provide any state law basis for a per se reversal rule.

C. POST-TROTTER DEVELOPMENTS
In 2000, the United States Supreme Court revisited the constitutional importance of peremptory challenges in United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). The Court in Martinez-Salazar decided the issue left open in Ross of whether, absent the requirement under the federal rules to use a peremptory challenge to cure an erroneous refusal by the trial court to excuse jurors for cause, "a denial or impairment of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been excused for cause." Ross, 487 U.S. at 91 n. 4, 108 S.Ct. 2273. The Court determined that Martinez-Salazar's use of a peremptory challenge to cure the trial court's error was consistent with the purpose of peremptory challenges, that is, securing trial by an impartial jury, and was not equivalent to the loss of a peremptory challenge. The Court affirmed the conviction.
It is clear from Ross and Martinez-Salazar that there is no federal constitutional right to peremptory challenges.[22] So, absent a showing that an objectionable juror served on the jury, the so-called "denial of a full complement of peremptory challenges" arising from the use of a peremptory challenge to cure an erroneous denial of a cause challenge does not constitute reversible error. In addition to there being no federal constitutional right to peremptory challenges, this Court has never established a state constitutional right to peremptory challenges. And, contrary to the majority, I believe we should not do so in this case.
*110 Since the Ross and Martinez-Salazar decisions, many other states have reconsidered their positions on peremptory challenges. The Wisconsin Supreme Court conducted an excellent analysis of peremptory challenge law in State v. Lindell, 245 Wis.2d 689, 629 N.W.2d 223 (2001), and reversed that state's long-standing per se error position in light of Ross and Martinez-Salazar. A number of other states have followed suit.[23] In fact, the majority of states currently do not require reversal unless a legally objectionable juror actually served on the jury.
In Florida, at least one appellate judge has asked the right question and reached the correct conclusion. In his dissent in Gootee v. Clevinger, 778 So.2d 1005 (Fla. 5th DCA 2000), Judge Harris posed the question that is at issue in this case: "[I]s the failure to get one's full complement of peremptory challenges itself so prejudicial that a new trial must always be granted?" Gootee, 778 So.2d at 1011 (Harris, J., dissenting). Judge Harris succinctly answered his question and, in so doing, showed why such a procedural error should be subjected to a harmless error analysis, not per se reversal. Judge Harris said:

Rollins requires an error which affects the fairness of the verdict; Trotter requires only that there have been an error in ruling on the "for cause" challenge and that (1) the peremptory challenges are exhausted to cure the error, (2) an additional challenge is requested (and denied), (3) for the purpose of challenging a specified juror who ultimately serves on the jury. I submit that although (1), (2), and (3) are essential in order to preserve the error (for without them there would clearly be no harm associated with the court's error), such preservation factors themselves fail to establish harm. Trotter, in effect, grants a reversal of even a fair verdict in order to reward a party for properly following the procedure to preserve the error. Rollins, Hamilton and Farina[ v. State, 679 So.2d 1151, 1152 (Fla.1996),] go further and ask, "Now that you have preserved the error, how have you been harmed?" Only by asking this question will we subject this procedural error, as we do even constitutional errors, to a harmless error analysis.

Gootee, 778 So.2d at 1013 (Harris, J., dissenting) (emphasis added).
I agree with Judge Harris. The Trotter requirements are a necessary  and judicially efficient  means of preserving potentially harmful error. However, this Court's original reliance on Swain to require per se reversal is obviously no longer sustainable.[24] And, because a per se reversal *111 rule no longer has any foundation in the federal constitution, we must look to see what state law demands. To do this, we must first determine the state law source of the right to peremptory challenges and then determine what standard of review to apply when a right from such a source is violated.

II. THE PURELY STATUTORY BASIS OF PEREMPTORY CHALLENGES
Peremptory challenges in Florida are purely a statutory right; they have no state constitutional foundation. In criminal trials, peremptory challenges are granted equally to the State and to the defendant by section 913.08, Florida Statutes (2003). As a statutory right, peremptory challenges are an important means to help ensure that both sides receive their state constitutional right to a fair trial before an impartial jury. But they are of no constitutional dimension. There is no express or implicit provision in Florida's constitution securing the right to peremptory challenges; and to hold otherwise is contrary to our own precedent.
Because peremptory challenges are only a statutory right given to help secure the constitutional right to a fair trial by jury, we are bound to apply a harmless error standard. The harmless error rule as codified in section 924.33, Florida Statutes (2003), and as applied by our own precedent dictates this result. This Court interpreted section 924.33 in State v. DiGuilio, 491 So.2d 1129, 1134 (Fla.1986), stating:
Section 924.33 respects the constitutional right to a fair trial free of harmful error but directs appellate courts not to apply a standard of review which requires that trials be free of harmless errors. The authority of the legislature to enact harmless error statutes is unquestioned. Contraposed to this legislative authority, the courts may establish the rule that certain errors always violate the right to a fair trial and are, thus, per se reversible. To do so, however, we are obligated to perform a reasoned analysis which shows that this is true, and that, for constitutional reasons, we must override the legislative decision.

(Original emphasis and footnote omitted; emphasis added.) In light of section 924.33, our statements in DiGuilio, and our historical application of the harmless error rule, I see no constitutional reason that supports a per se reversal rule in general or as applied in this case. As I have said, it is clear that Busby's constitutional right to an impartial jury was not violated. None of his jurors were legally objectionable. Because there is no federal constitutional right to peremptory challenges and because this Court's own precedent makes it clear that these challenges are not of a constitutional dimension, to require per se reversal in a case where a party receives what the constitution requires violates section 924.33 as interpreted by this Court in DiGuilio.[25]

III. THE MAJORITY OPINION
For the first time in Florida's long history, the majority announces that the right to peremptory challenges is constitutionally based. In doing so, the majority misapprehends the true constitutional right at issue and contradicts our previous case law to the contrary. As this Court stated in the post-Trotter case of Jefferson v. State, *112 595 So.2d 38, 41 (Fla.1992), "It is the right to an impartial jury, not the right to peremptory challenges, that is constitutionally protected. Peremptory challenges merely are a `means of assuring the selection of a qualified and unbiased jury.'" (Citations omitted; emphasis added.)
By the majority's decision today, the historical purpose and primary role of peremptory challenges have been lost. As I have suggested earlier, "if peremptory challenges have any constitutional significance at all, it must be because they serve as a check on the trial court's erroneous rulings on challenges for cause, and therefore act as a screen to increase the chances that biased jurors will not sit." William T. Pizzi & Morris B. Hoffman, Jury Selection Errors on Appeal, 38 Am.Crim. L.Rev. 1391, 1429 (2001); see also Martinez-Salazar, 528 U.S. at 319, 120 S.Ct. 774 (Scalia, J. concurring in the judgment) ("The resolution of juror-bias questions is never clear cut, and it may well be regarded as one of the very purposes of peremptory challenges to enable the defendant to correct judicial error on the point."). Instead of serving as a means to correct erroneous rulings on cause challenges, and thereby reducing the number of appeals needed to ensure an impartial jury, peremptory challenges in Florida have now evolved into another "constitutionally required" aspect of a jury trial for which per se reversal is applied. In light of this enormous step, I must reiterate the point that seems lost in the majority's decision. The constitutional provision that the majority must base its decision on is the constitutional right to an impartial jury. If Busby's jury was impartial, how can one say that his constitutional right to an impartial jury was violated?

A. THE MAJORITY CONCERNS
In various ways, the majority insists that modifying the per se rule of Trotter would be disastrous. The majority maintains that modifying the Trotter standard to require proof of actual harm for a conviction to be reversed would compromise the constitutional right to trial by an impartial jury. Respectfully, these statements are without substantive support. They are not supported by either the express rationale of prior cases from this Court, extrajudicial studies, or even anecdotal evidence that show a per se error rule is necessary to avoid impairing a party's state constitutional right to trial by jury. My point is best illustrated by a few simple questions unanswered by the majority. Where is the evidence that the constitutional right to trial by jury was impaired by the harmless error standard prior to Hill or Trotter? What evidence is there of any such impairment in the federal system or the majority of other states that require the proof of harm?
The majority says that "the curative use of a peremptory violates a defendant's right to a trial by impartial jury when that defendant can show that he or she went without the peremptories needed to strike a seated juror." Majority op. at 102-03. This begs the real constitutional question. Unless this "seated juror" is shown to be partial, how is the defendant's constitutional right to trial by an impartial jury deemed violated? The majority's conclusion that the mere "loss" of a peremptory challenge is always a violation of the right to a trial by an impartial jury can only be true if (1) that "seated juror" is always deemed partial and (2) one ignores the historical fact that correcting judicial errors "on the spot" is a primary reason peremptories were originally granted to parties. Since I have already addressed the historical purpose of peremptory challenges, I will speak only to the first part. Without a requirement to show that the "seated juror" was objectionable, one must either totally ignore the rebuttable presumption *113 that a juror is impartial or one must turn this presumption on its head. To do either flies in the face of previous statements by this Court and the United States Supreme Court that there is a rebuttable presumption that jurors are impartial. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Kessler v. State, 752 So.2d 545, 552 (Fla.1999) (quoting Bundy v. State, 471 So.2d 9, 19-20 (Fla.1985)).
Lastly, in its most extraordinary justification for maintaining the per se error rule, the majority says it is concerned that a defendant required to show harm could lose the ability to exercise all peremptories in situations where the trial court wrongly, although not purposefully, denies cause challenges equal to the number of peremptories granted and that without the Trotter per se reversal rule the defendant would have no remedy. I find nothing to support this concern. As I noted earlier, there is no evidence that any such problems have ever existed in Florida's trial courts. See supra note 4. And this concern is completely unsupported in the record before us. There is nothing in the selection of Busby's jury that even hints at any such injustice. See supra note 1. Absent any historical or record support for the concern about the wholesale loss of peremptories, I believe we should exercise the same restraint that the United States Supreme Court exercised sixteen years ago in Ross v. Oklahoma, 487 U.S. 81, 91 n. 5, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and not answer a question that is not before us. In Ross, the United States Supreme Court left this exact question open, and it has not had to address this open question since. Respectfully, we should exercise the same restraint.

B. THE IMPACT OF TROTTER

What has been the true impact of Trotter's per se error standard? I agree with the majority's analysis of the decisions in which this Court has addressed denial of cause challenges under Trotter. These decisions demonstrate that this Court's application of the Trotter standard is not responsible for the "multitudes of defendants seeking a new trial because of erroneously denied cause challenges." Nevertheless, this analysis ignores the impact of the per se reversal rule at the intermediate appellate court level. There are a significant number of cases where Florida district courts of appeal have reversed convictions and ordered new trials where defendants arguably received a trial by a fair and impartial jury.[26] These reversals illustrate the point that "constitutionalizing the impairment of peremptory challenges" runs counter to the Court's decision in Ross and is hardly "inconsequential" in view of the reality that "[t]rial courts ... rule on cause challenges by the minute," United States v. Martinez-Salazar, 146 F.3d 653, 661 (9th Cir.1998) (Rymer, J., concurring in part and dissenting in part), quoted in United States v. Martinez-Salazar, 528 U.S. at 316, 120 S.Ct. 774, "often between shades of gray." Id.
The real irony of the majority's approach is that despite the success of the peremptory challenge mechanism in helping to achieve the ultimate goal of a fair *114 and impartial jury, reaching this goal is actually impaired by the Trotter per se reversal rule because it forces trial courts to retry cases previously decided by fair and impartial juries. Busby is just another example where one harmless error is the basis for reversing a trial by a fair and impartial jury. Such reversals are "costly to the victims and to the judicial system," State v. Hickman, 205 Ariz. 192, 68 P.3d 418, 426 (2003), and "give[ ] a strong incentive to ... state legislators to cut down the number of peremptories  or eliminate them altogether." United States v. Annigoni, 96 F.3d 1132, 1150 (9th Cir.1996) (Kozinski, J., dissenting).

IV. MODIFICATIONS TO THE TROTTER STANDARD
Because there is no federal or state constitutional right to peremptory challenges, I believe we are bound to modify the per se reversal rule that this Court has interpreted Trotter to require. As we acknowledged in DiGuilio, absent a legitimate constitutional reason to override the legislative codification of the harmless error rule in section 924.33, we must require that a defendant show actual harm in order for a conviction to be reversed. DiGuilio, 491 So.2d at 1134. In other words, the defendant must meet the Trotter standards and must show that the juror identified as being "objectionable" was indeed a legally objectionable juror, i.e., a biased or partial juror. If the defendant makes such a showing, then harm has been proven and a violation of the defendant's constitutional right to a fair trial has been established. In such a case, the defendant would be entitled to a new trial. If the juror identified by the defendant as being objectionable is in actuality not legally objectionable, the defendant has suffered no harm and is not entitled to a new trial because any error in denying the challenge for cause was rendered harmless.

V. APPLICATION TO BUSBY'S CASE
After the trial court erroneously denied Busby's challenge for cause, Busby identified jurors Liebel and Winston as "objectionable jurors." However, Busby did not challenge either of these jurors for cause. Liebel was dismissed during the trial and therefore did not serve on the final jury and is of no consequence. Busby objected to Winston because Winston's son was a correctional officer. Winston repeatedly stated that he could be impartial and would not be influenced by his son's occupation. Clearly, Winston was not a legally objectionable juror. Therefore, Busby received what the constitution guarantees, a fair trial by an impartial jury. The good-faith mistake made by the trial court in denying Busby's cause challenge to Lapan was corrected by the tool granted by the state to remedy such errors made "in the heat of battle."

VI. CONCLUSION
Although the challenge for cause of venireperson Lapan should have been granted, no legally objectionable juror served on the jury, and it is clear that Busby received a fair trial by an impartial jury. For this reason, I would not reverse Busby's conviction but would instead consider the merits of the other issues he presents.
WELLS and CANTERO, JJ., concur.
NOTES
[1] The State also proffered testimony from State Attorney's Office Investigator Lisa Long, who stated that she saw Busby make hand gestures to Globe during the videotaping of Globe's testimony. Outside the presence of the jury, Busby testified that he had signed the word "liar" to Globe. On cross-examination, Busby stated that he had called Globe a liar when Globe said that he acted alone in murdering Ard. The State presented Long's testimony to the jury and read to the jury the transcript of Busby's testimony concerning the "liar" sign. Busby then presented surrebuttal testimony from Globe that he did not see Busby's hand gestures, and even if he had, it would not have affected his testimony.
[2] These aggravating factors are: (1) crime committed while previously convicted of a felony and under sentence of imprisonment; (2) prior conviction of a felony involving the use or threat of violence; (3) heinous, atrocious, or cruel (HAC); and (4) cold, calculated, and premeditated (CCP).
[3] The trial court identified the following possibly mitigating factors presented by the defense: (1) age at time of crime; (2) loved by family; (3) emotional handicaps; (4) witness to domestic violence; (5) deprived childhood; (6) poor upbringing; (7) cooperation with law enforcement; (8) first incarcerated at a young age; (9) sexual abuse by biological father; (10) physical abuse by biological father; (11) abandonment by family; (12) witnessed mother engage in prostitution by luring in truckers on CB; (13) placed in position as prey to sexual predators in prison; (14) abandoned by foster care parents; (15) attempted suicide at six years of age and admitted into hospital as a result of such; (16) witnessed sexual abuse of sisters by father; (17) witnessed sister on sister sexual abuse; (18) sexually abused by sister's boyfriend; (19) suffered sexual abuse from sister; (20) witnessed physical abuse by father upon mother; (21) witnessed physical abuse by father upon sisters; (22) witnessed physical abuse by mother upon sisters; (23) mother's continued denial of abuse and attempts to shift blame; (24) mother's constant criticism and blame which destroyed self-esteem; (25) suffered institutional neglect while in care of the Department of Health and Rehabilitative Services; (26) suffered sexual harassment as a result of institutional neglect of Department of Corrections while in prison; (27) trauma of deprivation of love and nurturing (particularly in formative years); (28) artistic ability; (29) learning disabled; (30) chaotic and violent childhood; (31) sexually harassed in prison; (32) impaired mental capacity; (33) good work habits; (34) loyal, devoted, and kind to adopted father; (35) small in stature which led to inmate sexual abuse; (36) heartache and sadness in life; (37) voluntary confession in this case; (38) codefendant caused death of victim; (39) poor judgment and impulsive behavior; (40) low self-esteem; (41) feelings of being persecuted, exploited, resulting in mistrust; (42) prior suffering created stress that led to offense that was committed for emotional reasons; (43) no true childhood friends; (44) dominated by codefendant; (45) unable to formulate a clear victim/offender identity; (46) abuse was not reported early; (47) mother did not believe claim of abuse; (48) poor access to information as to what happened throughout defendant's development; (49) confessed in first homicide case; (50) remorse about murders in first homicide case; (51) cooperative with law enforcement in defendant's first homicide case; (52) cooperative in the investigation of the homicide of Elton Ard; (53) poor judgment and impulsive behavior; and (54) feelings of being persecuted and exploited, resulting in mistrust.
[4] In addition to the issue addressed in this opinion, Busby argued that the trial court erred by: (1) excluding self-defense testimony; (2) admitting the testimony of State Attorney Investigator Lisa Long and by admitting a transcript of Busby's proffered testimony; (3) allowing codefendant Globe to testify by videotape; (4) denying the motion to suppress Busby's July 3 and 7 statements; (5) admitting evidence of prior bad acts under Williams v. State, 110 So.2d 654 (Fla.1959); (6) admitting during the penalty phase a transcript of the July 7 confession; (7) finding the CCP aggravator; (8) excluding defense penalty phase exhibits; (9) admitting during the penalty phase a letter written by Busby to Globe; and that (10) the court erred during the penalty phase by admitting evidence of Busby's prior violent felony convictions; (11) the penalty phase instructions violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (12) Florida's death penalty statute is unconstitutional.
[5] Valdez, a death row inmate at Florida State Prison, died after an altercation with prison guards.
[6] This exchange followed questioning by the prosecution in which Lapan answered generally that he understood the bifurcated nature of death penalty proceedings and could follow the trial court's instructions with regard to assessing and weighing aggravating and mitigating circumstances in a sentencing recommendation.
[7] It is important that adequate records be established and preserved, particularly with regard to matters as sensitive as this process. In this case, the record gives little insight as to the trial judge's assessment of Lapan's candor or the relative certainty of his answers that would be directed to consideration of the challenge for cause. Without an explanation of the trial court's ruling, we rely on Lapan's responses as they appear to us from a cold record.
[8] The Swain Court held that it was permissible to insulate from inquiry a prosecutor's removal of African-Americans from a particular jury on the assumption that the prosecutor's action had an acceptable basis. See Swain, 380 U.S. at 221-22, 85 S.Ct. 824. The Court further determined that to establish an equal protection violation, a defendant must show that the prosecutor had systematically, in case after case, removed African-Americans from all jury panels, "whatever the crime and whoever the defendant or the victim may be." Id. at 223, 85 S.Ct. 824. In Batson, the United States Supreme Court reversed itself and held that race-based peremptory challenges violate the equal protection rights of both the defendant and the struck juror. The Court also established a three-step inquiry to demonstrate the nondiscriminatory use of a challenge. See Batson, 476 U.S. at 97-98, 106 S.Ct. 1712.

Our invocation of the Swain Court's explanation of the history and role of peremptory challenges should not be viewed as an endorsement of the discriminatory challenge scheme inoculated by that opinion. To the contrary, we note that the Florida Supreme Court's efforts in eliminating racial bias in the use of peremptory challenges preceded those at the federal level. See State v. Neil, 457 So.2d 481 (Fla.1984), clarified, State v. Castillo, 486 So.2d 565 (Fla.1986). This Court has expanded the Batson/Neil doctrine to include other protected classes of venirepersons to ensure that peremptory challenges do not serve as a vehicle for discrimination in Florida courts. See State v. Alen, 616 So.2d 452 (Fla.1993) (recognizing Hispanics as a cognizable ethnic group).
We rely on the High Court's reasoning in Swain only to the extent necessary to support our opinion that  properly used  peremptory challenges are fundamental to each party's ability to realize the constitutional guarantee of trial by an impartial jury.
[9] Gore v. State, 846 So.2d 461, 471 (Fla.2003); Benedith v. State, 717 So.2d 472, 475 (Fla.1998); Mendoza v. State, 700 So.2d 670, 674-75 (Fla.1997).
[10] Bolin v. State, 869 So.2d 1196, 1200 (Fla.2004); Kokal v. Dugger, 718 So.2d 138, 142 (Fla.1998); Kearse v. State, 662 So.2d 677, 683 (Fla.1995); Pietri v. State, 644 So.2d 1347, 1352 (Fla.1994); Knowles v. State, 632 So.2d 62, 65 (Fla.1993); Hitchcock v. State, 578 So.2d 685, 689 (Fla.1990), vacated on other grounds, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); Penn v. State, 574 So.2d 1079, 1081 (Fla.1991).
[11] Conde v. State, 860 So.2d 930, 941-42 (Fla.2003); Overton v. State, 801 So.2d 877, 894 (Fla.2001); Bryant v. State, 656 So.2d 426, 428 (Fla.1995).
[12] Kearse v. State, 770 So.2d 1119, 1128 (Fla.2000); Van Poyck v. Singletary, 715 So.2d 930, 931 (Fla.1998); Farina v. State, 679 So.2d 1151, 1153-54 (Fla.1996), receded from on other grounds by Franqui v. State, 699 So.2d 1312, 1320 (Fla.1997); Dillbeck v. State, 643 So.2d 1027, 1028 (Fla.1994).
[13] In his concurring opinion in Martinez-Salazar, Justice Souter highlighted the pertinent distinction:

I write only to suggest that this case does not present the issue whether it is reversible error to refuse to afford a defendant a peremptory challenge beyond the maximum otherwise allowed, when he has used a peremptory challenge to cure an erroneous denial of a challenge for cause and when he shows that he would otherwise use his full complement of peremptory challenges for the noncurative purposes that are the focus of his peremptory right. Martinez-Salazar did not show that, if he had not used his peremptory challenge curatively, he would have used it peremptorily against another juror. He did not ask for a makeup peremptory or object to any juror who sat. Martinez-Salazar simply made a choice to use his peremptory challenge curatively.
Martinez-Salazar, 528 U.S. at 317-18, 120 S.Ct. 774 (Souter, J., concurring).
[14] People v. Crittenden, 9 Cal.4th 83, 36 Cal.Rptr.2d 474, 885 P.2d 887, 907 (1995); People v. LeFebre, 5 P.3d 295, 307 (Colo.2000); State v. Kauhi, 86 Hawai'i 195, 948 P.2d 1036, 1039 (1997); Thomas, 864 S.W.2d at 259; State v. Albano, 119 Me. 472, 111 A. 753, 753 (1920); Commonwealth v. Auguste, 414 Mass. 51, 605 N.E.2d 819, 824 (1992); State v. Freshment, 309 Mont. 154, 43 P.3d 968, 975 (2002); Fuson v. State, 105 N.M. 632, 735 P.2d 1138, 1141 (1987); State v. Conner, 335 N.C. 618, 440 S.E.2d 826, 834 (1994); State v. Tyler, 50 Ohio St.3d 24, 553 N.E.2d 576, 587 (1990), superseded on other grounds by constitutional amendment as stated in State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997); Commonwealth v. Impellizzeri, 443 Pa.Super. 296, 661 A.2d 422, 426-27 (1995); Johnson v. State, 43 S.W.3d 1, 5-6 (Tex.Crim.App.2001); State v. Santelli, 159 Vt. 442, 621 A.2d 222, 224 (1992).

The Court acknowledges that in six of the twenty jurisdictions, reversal is required because peremptory challenges are either a constitutional right or because state law either requires reversal or provides that the parties can exercise their peremptories against a panel where none of the jurors are subject to challenges for cause. See State v. Esposito, 223 Conn. 299, 613 A.2d 242, 249-50 (1992) (right to use peremptories guaranteed by state constitution); Kirkland v. State, 274 Ga. 778, 560 S.E.2d 6, 8 (2002) (statutory right to exercise peremptories against a panel free from exception); State v. Cross, 658 So.2d 683, 686 (La.1995) (right to use peremptories guaranteed by state constitution); People v. Cahill, 2 N.Y.3d 14, 777 N.Y.S.2d 332, 809 N.E.2d 561 (2003) (statute provides that reversal is warranted for erroneous denial of for-cause challenge when defendant exhausts peremptory challenges); David v. Commonwealth, 26 Va.App. 77, 493 S.E.2d 379, 381 (1997) (statutory right to exercise peremptory strikes against a panel free from exception); State v. Phillips, 194 W.Va. 569, 461 S.E.2d 75, 94 (1995) (accepting the constitutional analysis contained in Ross but upholding per se reversal based on statutory right to exercise peremptories against a panel free from exception).
[15] Albano, 111 A. at 753 (requiring exhaustion of peremptory challenges and the seating of an "objectionable" juror); Johnson, 43 S.W.3d 1 at 5-6 (requiring exhaustion of peremptory challenges, denial of request for additional peremptories, and identification of a seated juror who is objectionable); Santelli, 621 A.2d at 224 (requiring exhaustion of peremptory challenges and communication of the desire to peremptorily challenge another juror).
[16] Crittenden, 36 Cal.Rptr.2d 474, 885 P.2d at 907 (requiring exhaustion of peremptory challenges and communication to the trial court that the defendant is dissatisfied with the jury selected); LeFebre, 5 P.3d at 307 (requiring exhaustion of peremptory challenges); Kauhi, 948 P.2d at 1039 (applying a true "per se" standard requiring reversal whenever a defendant is forced to use a peremptory challenge to remove a juror who should have been removed for cause); Thomas, 864 S.W.2d at 259 (requiring exhaustion of peremptory challenges); Auguste, 605 N.E.2d at 824 (same); Freshment, 43 P.3d 968 at 975 (same); Fuson, 735 P.2d at 1141 (same); Tyler, 553 N.E.2d at 587 (same); Impellizzeri, 661 A.2d at 426-27 (same).
[17] And, as we consider this one procedural error in light of Trotter v. State, 576 So.2d 691 (Fla.1991), we should not lose sight of its context. The entire mechanism of jury selection worked to achieve the ultimate objective, a fair and impartial jury. Busby challenged eight potential jurors for cause: four of these challenges were granted, four were denied. Only the one denial related to Lapan was in error. Prior to Busby making his challenges for cause, the trial court removed twelve jurors sua sponte. The State also successfully removed six jurors for cause. Two of the State's cause challenges removed jurors biased against Busby and in favor of the State. In addition to these successful cause challenges, Busby used all ten of his peremptory challenges (plus one on an alternate) while the State used nine of its ten peremptory challenges. In the end, no objectionable juror was empaneled.
[18] Art. I, § 22, Fla. Const.
[19] A detailed history of peremptory challenges is provided in William T. Pizzi & Morris B. Hoffman, Jury Selection Errors on Appeal, 38 Am.Crim. L.Rev. 1391, 1403-06 (2001).
[20] And, on this point, I share the important but purely hypothetical concern the majority raises in its objection to my suggestion that the Trotter standard be modified. A trial court's repeated and deliberate denial of appropriate challenges for cause would be a violation of both federal and state law. But, just as in Ross, that is clearly not the case before us now and it is an unsupported, insufficient reason for a global, per se reversible error rule. Except for the majority's concerns stated in opposition to modifying the Trotter standard, the abusive denial of proper cause challenges by trial judges has never been articulated by this Court as a reason for the per se reversal rule, nor is there any factual support for such a rationale. The majority does not cite to any evidence that abusive denial of cause challenges was a problem before Trotter, and there is no evidence to support the existence of such a problem in those jurisdictions that require the showing of harm.
[21] See Conde v. State, 860 So.2d 930, 941 (Fla.2003); Pietri v. State, 644 So.2d 1347, 1352 (Fla.1994); Knowles v. State, 632 So.2d 62, 65 (Fla.1993).
[22] As the United States Supreme Court has said, peremptory challenges "are but one state-created means to the constitutional end of an impartial jury and a fair trial." Georgia v. McCollum, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). In fact, that Court "repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." Id. (emphasis added).
[23] See Dailey v. State, 828 So.2d 340 (Ala.2001); Minch v. State, 934 P.2d 764, 769-70 (Alaska Ct.App.1997); State v. Hickman, 205 Ariz. 192, 68 P.3d 418 (2003); Bangs v. State, 338 Ark. 515, 998 S.W.2d 738, 744-45 (1999); State v. Pelletier, 209 Conn. 564, 552 A.2d 805, 810 (1989); State v. Ramos, 119 Idaho 568, 808 P.2d 1313, 1315 (1991); Dye v. State, 717 N.E.2d 5, 18 n. 13 (Ind.1999); State v. Neuendorf, 509 N.W.2d 743, 747 (Iowa 1993); State v. Anderson, 603 N.W.2d 354, 356 (Minn.Ct.App.1999) (citing State v. Stufflebean, 329 N.W.2d 314, 317 (Minn.1983)); Johnson v. State, 754 So.2d 576, 578 (Miss.Ct.App.2000); State v. Storey, 40 S.W.3d 898, 904-05 (Mo.2001); State v. Entzi, 615 N.W.2d 145, 149 (N.D.2000); Myers v. State, 17 P.3d 1021, 1027-28 (Okla.Crim.App.2000); Green v. Maynard, 349 S.C. 535, 564 S.E.2d 83 (2002); State v. Verhoef, 627 N.W.2d 437 (S.D.2001); State v. Middlebrooks, 840 S.W.2d 317 (Tenn.1992); State v. Menzies, 889 P.2d 393, 399-400 (Utah 1994); State v. Fire, 145 Wash.2d 152, 34 P.3d 1218 (2001).
[24] Revealingly, the United States Supreme Court, in Martinez-Salazar, noted  in dicta  that the Swain standard of automatic reversal was itself dicta and that it was founded on "a series of [United States Supreme Court] early cases decided long before the adoption of harmless-error review." 528 U.S. at 317 n. 4, 120 S.Ct. 774.
[25] See Jefferson v. State, 595 So.2d 38, 41 (Fla.1992); State v. Neil, 457 So.2d 481, 486 (Fla.1984); Carroll v. State, 139 Fla. 233, 190 So. 437, 438 (1939).
[26] For a representative sample of reversals, see, e.g., Bell v. State, 870 So.2d 893 (Fla. 4th DCA 2004); Rodas v. State, 821 So.2d 1150 (Fla. 4th DCA 2002); Rodriguez v. State, 816 So.2d 805 (Fla. 3d DCA 2002); Taylor v. State, 796 So.2d 570 (Fla. 2d DCA 2001); Mobley v. State, 774 So.2d 782 (Fla. 2d DCA 2000); Hall v. State, 682 So.2d 208 (Fla. 3d DCA 1996); Davis v. State, 656 So.2d 560 (Fla. 4th DCA 1995); Diaz v. State, 608 So.2d 888 (Fla. 3d DCA 1992); Street v. State, 592 So.2d 369 (Fla. 4th DCA 1992); Henry v. State, 586 So.2d 1335 (Fla. 3d DCA 1991).